IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


NORFOLK SOUTHERN RAILWAY
COMPANY,

                            Plaintiff,                     Case No. 3:05 CV 7304

       -vs-

                                          <u>MEMORANDUM  OPINION</u>

JAMES R. JACOBS, etc., et al,

                         Defendant.

KATZ, J.

## I. Background

     This case arises out of a contractual relationship between Consolidated Rail Corporation ("Conrail"), Norfolk Southern Railway Company ("Norfolk Southern"), and James R. Jacobs (or "James Jacobs") d/b/a J-Star Consolidated, J-Star Consolidated, Inc., and Jacobs Industries, Inc. (corporations collectively referred to as "Jacobs") relating to certain property located in Lucas County, commonly referred to as Airline Yard (or "the Property").

     Conrail (Norfolk Southern's predecessor-in-interest to the Property) had a contract with Chrysler Corporation ("Chrysler") to provide interstate transport services to Chrysler for its eastbound new vehicle production from its Toledo, Ohio Jeep plant.  At that time, Conrail did not have Chrysler's origin (local) switching and vehicle transloading business. This work was being performed by the Ann Arbor Railroad at its facility in north Toledo.

     In 1995, Conrail entered into business discussions with Jacobs.  McNeil Depo. at 38; J. Jacobs Depo. at 24-25; 30-31.  Conrail, seeking to avoid the capital expense of developing an automobile transloading facility, planned to have Jacobs, at its cost, construct an automobile

transloading facility at Conrail's Airline Yard, which became the Toledo Automotive Terminal. McNeil Depo. at 43. Jacobs would then provide vehicle transloading services and would be compensated on a per-vehicle basis for such services.

The compensation rate was to be set at an above-market price that would allow Jacobs, over time, to recover development expenses. McNeil Depo. at 43, 69-70. To effectuate their agreement, Jacobs and Conrail entered into two contracts drafted by Conrail: a Property Lease dated October 16, 1995 ("Lease"), and a General Service Contract dated December 13, 1995 ("Service Agreement"). Pursuant to the Property Lease, Conrail agreed to lease Jacobs a tract of land adjacent to two railroad tracks operated by Conrail for a lease term of five years at a rate of one dollar per year. Lease at ¶¶ 1–3. Under the terms of the Lease, Jacobs agreed to pay all taxes and utilities for the Property. Lease at ¶¶ 6-7. A five year renewal option was included in the Lease. Lease at ¶36.

Pursuant to the Service Contract, Jacobs was obligated to load and unload autos from Conrail rail cars, as well as adhere to certain safety precautions related to such work. *See* Svc. Contract, Appx. II at ¶¶ 1–20. In exchange for Jacobs's services, Conrail agreed that the Terminal would "operate up to 24 hours per day 7 days per week," and that "Conrail will supply or make available expected train volume and arrival times by the end of each working day, but Conrail does not guarantee actual train arrival times." *Id.* at ¶ 21. The Service Contract also contained a standard incorporation clause:

> This agreement together with all Schedules, Appendices and Exhibits constitutes the entire agreement between the parties and supersedes all previous agreements and understandings relating to the services required under this agreement.

*Id.* at Art. 16(F).  The terms of the Service Agreement were later modified to provide that Conrail would pay for the utilities and taxes on the Property during the operation of the Service Agreement.

A large part of the parties' dispute revolves around the "expected train volume" language. According to Norfolk Southern, during the negotiation process, Jacobs sought to reallocate the risk of the development to Conrail by establishing a minimum vehicle volume guarantee to be made by Conrail.  Jacobs' Memorandum in Support of its Motion for Declaratory Judgment, Doc. 47, Ex. 3 at 3.  Conrail claims to have rejected Jacobs' request for such a guarantee.  *Id.* at 9. Conrail explained that if such a volume guarantee were provided, the economics of the deal would change and Conrail would do the development itself.  *Id.*  If Conrail had provided the volume guarantee sought by Jacobs, it claims it would have been forced, by accounting requirements, to capitalize this investment and show it as a liability on its financial records, which was the effect it was seeking to avoid by involving Jacobs.  McNeil Depo. at 9.  If the cost and risk of the development were solely with Jacobs, Conrail claims it would not have had to reflect a liability on its financial records.  *Id.*  In a September 4, 1995 letter, Jacobs sought a volume commitment by asking:

> D. . . . Basically only one concern. Conrail should give a[n] obligation of average volume amount of 28,000 units for 5 years.  This constitutes only the basic volume of eastbound traffic, thus it should be achievable.
> > 1. In essence, what I'm looking for is a total of 140,000 vehicles in 5 years @ 6.00 each, thus we inbound 840K, not enough to pay the bill, but enough to show good faith from Conrail, since the deal is structured on years not on cars.

*Id.* at 2.

Conrail's response in its September 8, 1995 letter was:

> D. A set volume commitment would materially change the deal from our standpoint, and would lead Conrail to invest the capital itself and contract the facility in a more traditional manor. We may be in a position to commit that all outbound Chrysler shipments, moved contractually by Conrail, would utilize this facility.

*Id*. at 9.

Jacobs has a different impression of the negotiations. Jacobs posits that the phrase "expected train volume" refers to a volume commitment Conrail made during the course of contract negotiations. Because Jacobs was investing all of the capital necessary to build the Toledo Automotive Terminal, even though Conrail stood to profit from its creation, Jacobs recalls insisting that Conrail commit a minimum volume of traffic to guarantee a steady revenue stream into the Terminal. Jacobs takes the language from the September 4 and 8, 1995 letters to illustrate the understanding that a specific volume commitment was intended by the parties and is incorporated into the Service Agreement by the "expected train volume" clause. Jacobs also points to a September 18, 1995 memo in which Conrail states in a letter to Jacobs that it would "make the following commitment":

> Conrail currently has under contract Chrysler finished vehicle traffic from Toledo terminating in Albany, NY, Westborough, MA, and Newark, NJ. The existing contract is for a period of six years, and has another five years remaining. This traffic is currently approximately 28,000 vehicles per year. Conrail will commit to handle this traffic at the proposed Airline Auto Terminal [later renamed the Toledo Automotive Terminal], effective January 1, 1996.

*Id*. at 10. The letter further states:

> It is understood between the parties that any definitive agreement will contain other terms and conditions which will have to be negotiated and agreed to before it could be finalized. The above commitments are contingent on reaching mutual agreement regarding the Terminal Operating Agreement [what would become the General Service Contract] and the property lease itself.

4

*Id.* Conrail notes that the attached letter was not on Conrail letterhead, and Conrail's Douglas McNeil testified that the signature on the letter purporting to be his own was not his.  McNeil Depo. at 7.  Conrail argues that the letter was identified as a draft and it was never memorialized into a final version.  Conrail also notes that it did, in fact, run all of its loading of Chrysler finished vehicle traffic from the Toledo Jeep plant through the Toledo Terminal, which is at most what the letter suggests Conrail would be willing to do.  It was not until Chrysler terminated its agreement with Conrail for loading services and moved the loading and local switching work to the Ann Arbor Railroad that volume at the Toledo Terminal decreased.

In a document titled "Toledo Airline Auto Terminal Proposal Outline," dated August 31, 1995 (five days before Jacobs requested the Chrysler traffic), Conrail states that it intended to make "no" volume commitment to Jacobs. *Id.* at p. 13.  However, in a revised version of the Proposal Outline dated October 19, 1995 (a month after Conrail's September 18, 1995 commitment letter), Conrail expressly states, under the heading "Volume Commitment," that it has committed to the Toledo Automotive Terminal "all Chrysler traffic destined for Conrail ramps, including Westboro, MA, Selkirk, NY, Doremus Ave., NJ, and Newark, DE." *Id.* at p. 15.  Thus, says Jacobs, the October 19, 1995 Proposal Outline shows that Conrail understood it had committed its eastbound Chrysler finished vehicle work to Jacobs prior to entering the Service Contract.

The Lease contained other provisions of importance to the resolution of the parties' claims. It provided the following, regarding use of the property:

> 5.1 Use of Reserved Facilities. Landlord may operate existing railroad and related transportation services on or adjacent to the Premises.  Landlord reserves the right to operate, maintain, repair, replace, augment, or relocate (provided that said relocation or augmentation does not unreasonably interfere with Tenant's use of the

Premises for the purposes set forth in Section 4) any Reserved Facilities existing within or adjacent to the Premises.

* * *

5.2 Definition of Reserved Facilities. The term "Reserved Facilities" shall mean any existing tracks, pipes, conduits, thoroughfares, roads, tunnels, electric communication and signal transmission lines and poles and guys for such lines, and any other facilities of similar nature on, above or below the ground, belonging to any party whomsoever.

Lease at ¶5.

The Lease provided the following regarding improvements made to the property:

Tenant shall completely remove all improvements made by tenant upon the Premises prior to the termination of this Lease and restore the Premises to a condition satisfactory to Landlord. Tenant shall provide Landlord with a minimum of thirty (30) days prior notice when Tenant intends to remove any improvements in accordance with the previous sentence. If Tenant fails to completely remove such improvements and other property of Tenant and any other party (other than Landlord), Landlord may elect to retain such improvements or property, or enter the Premises and raze or remove same and Tenant hereby waives any claim or right of action with respect thereto.

Initially, Jacobs' and Conrail's plan went well; Jacobs completed the initial development, or Phase I, and the parties decided to expand the operation at Airline Yard with a Phase II expansion.  Jacobs paid the cost of the Phase I improvements and Conrail financed the construction of Phase II improvements.  J. Jacobs Depo. at 39-40.

Once the facility was constructed, Jacobs performed loading services satisfactorily to all parties.  However, in 1997 Chrysler was developing its new Jeep plant in north Toledo. As part of that development, Chrysler needed a piece of property owned by the Ann Arbor Railroad. The Ann Arbor Railroad agreed to relinquish that property in exchange for re-acquiring the exclusive local switching and transloading work for the production from the new Jeep plant.  In December of 1997, Chrysler provided formal notification of the new arrangement, i.e., that the local switching and auto transloading work would not be conducted at the Toledo Auto Terminal, but,

6

rather, would be done by the Ann Arbor Railroad at the Ann Arbor's facility.  Accordingly, in late December of 1997, the volume of Chrysler traffic into the Terminal started to decline.  Jacobs's internal loading records show that, in 1998, Jacobs loaded only 7,581 Chrysler vehicles supplied by Conrail at the Terminal, and in 1999 only 4,334.  Eventually the Chrysler work left the Toledo Auto Terminal entirely.

Around that same time, a split of the Conrail assets and business between Norfolk Southern and CSX was in the works, and on June 1, 1999, that split was finalized. Under the terms of the division, Norfolk Southern took control of the Property and succeeded to Conrail's interest in the Lease and Service Agreement going forward from June 1, 1999. After Norfolk Southern had succeeded to Conrail's interest and with the Chrysler local switching and transloading work gone, Norfolk Southern terminated the Service Agreement, pursuant to its terms, effective on October 31, 2000.  Jacobs elected to renew the Lease for the additional five year option term. With the termination of the Service Agreement, Jacobs was once again obligated to pay taxes and utilities for the Property.  Lease at ¶6-7.  However, Norfolk Southern continued to pay the utilities and taxes on Airline Yard for approximately the next five years without sending an invoice to Jacobs until April, 2005, when Norfolk Southern invoiced Jacobs for the previous more-than four years of utilities and taxes.  As of July, 2005, Jacobs had not paid those invoices.

After the termination of the Service Agreement and during the Lease extension term, Jacobs entered into an arrangement with Vascor Corp. for the temporary storage of finished automobiles manufactured by Chrysler.  From April to June 2005, Jacobs and Norfolk Southern had several communications with respect to the use of the Property, the unpaid utilities and the future of the Lease. It was clear that Jacobs would not be staying at the Property. On June 29,

7

2005, Jacobs notified Norfolk Southern that it intended to remove improvements from the Property. On July 13, 2005, Norfolk Southern served Jacobs with a notice of termination of the Lease effective July 19, 2005, based on failure to pay the amounts due for taxes and utilities.

On July 21, 2005, Norfolk Southern filed the underlying action in which it sought possession of the Property, a judgment for unpaid taxes and utilities owed by Jacobs to Norfolk Southern, as well as a determination as to the ownership of the improvements on the Property. In response, Jacobs filed a Counterclaim alleging that Norfolk Southern had breached the Service Agreement, trespassed on the property, received unjust enrichment, and failed to provide rail service to the Property in violation of 49 U.S.C. §11101. During the pendency of this action, the Lease by its own terms expired on October 22, 2005 and Norfolk Southern sent an additional notice to Jacobs to vacate the premises based on the Lease expiration. On November 22, 2005, the parties reached an agreement regarding the eviction action and possession of the Property. Jacobs voluntarily vacated and surrendered control of the premises on December 1, 2005. Conrail was joined by Jacobs as a third party Defendant on October 1, 2007.

Jacobs filed a motion for declaratory judgment on January 22, 2008. (Doc. 47.) Conrail and Norfolk Southern filed a motion for summary judgment on February 26, 2008 (Doc. 53), as did James Jacobs (Doc. 55) and the Jacobs corporations (Doc. 58). This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II. Standard of review

### A. Summary judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

8

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating

the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.*

at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot

rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go

beyond the pleadings" and present some type of evidentiary material in support of its position.

*Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).

Summary judgment must be entered "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all

reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams    v.*

*Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### B. Declaratory judgment

With regard to the declaratory judgment, the Federal Declaratory Judgment Act provides that any federal court "may declare the rights and other legal relations of any interested party seeking" a declaration in a controversy over which the Court otherwise has jurisdiction.  28 U.S.C.A. § 2201(a).  The Sixth Circuit has identified two principal criteria guiding a court's decision whether to render a declaratory judgment: (1) "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue"; and (2) "when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs.*, 16 Fed. Appx. 433, 437 (6th Cir. 2001) (quoting *Grand Trunk W. R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  Other factors include: whether the judgment would settle the controversy; whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue; whether the declaratory

10

remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*"; whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and whether there is an alternative remedy that is better or more effective. *Zide Sport*, 16 Fed. Appx. at 437.

## III. Discussion

There are basically six issues (among the numerous but well-written pleadings submitted by the parties) which this Court will decide: (1) whether James R. Jacobs may be held personally liable as an agent of the Jacobs corporations, (2) whether the "expected train volume" language in the Service Agreement is ambiguous and warrants the admittance of extrinsic evidence to clarify it, (3) whether Jacobs is liable for the utility bills accumulated at the Toledo Terminal during the second property lease period, (4) which party is entitled to the improvements to the Terminal, (5) whether the Norfolk Southern agents trespassed at the Toledo Terminal, and (6) whether Norfolk Southern violated certain carrier regulations.

### A. Personal liability of James R. Jacobs

Defendant James R. Jacobs has moved for summary judgment on all claims asserted against him in his personal, individual capacity. Plaintiff Norfolk Southern's claims against Jacobs in his individual capacity are based on the way in which he executed various agreements. On the original Lease, which listed the tenant as "J. Star Consolidated," he signed as "James R. Jacobs, V. President, J. Star Consolidated." In the later modification to the Lease, in which the tenant was labeled "Jacobs Industries," he signed only as "James R. Jacobs." Norfolk Southern notes that the signature on the modification lacked the state-required corporate form (i.e., "Company," "Co.," "Corporation," "Corp.," "Incorporated," or "Inc."), and there was no

indication of assignment on the original lease from J. Star Consolidated to Jacobs Industries. *See* Ohio Rev. Code § 1705.01(A). There was an Ohio corporation known as "J-Star Consolidated, Inc." in existence at the time the original Lease and subsequent modification were executed, but there was no "Jacobs Industries" registered with the Ohio Secretary of State on January 12, 1996, when the lease tenant was changed to "Jacobs Industries." On March 11, 1996, Jacobs Industries, LLC was formed. The Lease was signed on October 16, 1995, and the modification on January 12, 1996. Jacobs Industries, LLC was party to the Supplemental Agreement to the Lease that was signed on May 21, 2001, which listed the contracting parties as "Norfolk Southern Railway Company, a Virginia corporation" and "Jacobs Industries, a(n) Ohio Limited Liability Co."

Under Ohio law[1], when an individual signs an agreement without clearly identifying the corporation for which the person intended to sign, that person is exposed to individual liability for that agreement. *West Shell Commercial v. NWS, LLC,* 2007 Ohio 460 (Ohio Ct. App. 2007); *Vulcan Corp. v. Freeland*, 2006 Ohio 4033, P10 (Ohio Ct. App. 2006). Furthermore, when an individual signs a contract on behalf of a not-yet-formed company, he is personally liable unless the parties execute a novation. *Illinois Controls v. Langham*, 70 Ohio St. 3d 512, 524 (Ohio 1994).

> The corporate name indicators that must be a part of the corporate name in the articles of incorporation submitted to the Secretary of State are mandatory in order to initially form a corporation. The omission of a corporate name indicator in subsequent business dealings does not extinguish the existence of a corporation and

---

[1] "Indiana law was contractually designated as the law to be applied when interpreting the contract in this case. Nonetheless, as appellant urges, whether or not an *Ohio* corporation existed would be a matter of Ohio law rather than Indiana law." *Promotion Co. v. Sweeney*, 150 Ohio App.3d 471, 477 (Ohio App. 2002) (emphasis in original). The same principle applies here, where the parties contracted under Pennsylvania law, but the question is the existence of an Ohio corporation.

> place personal liability on the representative who signs a contract for the company. *See, e.g., United States v. Kessler* (S.D.Ohio 1972), 338 F.Supp. 420 (citing the law within R.C. 1701.04(A) and (E) and holding that once an Ohio corporation is properly formed, corporate existence is not extinguished by a failure to comply with a law such as the securities provisions contained in R.C. Chapter 1707).

*Promotion Co. v. Sweeney*, 150 Ohio App.3d 471, 478 (Ohio Ct. App. 2002).  In *Sweeney*, the agent's representative capacity was not explicit, but there was "a business name under the individual's name and a business name used throughout the agreement . . . [which was] the 'final end user' of all services and [was] obligated to make payments."  *Id.* at 479.  The court found that "the principal was disclosed" and further that "the omission of 'Inc.' by the plaintiff-drafter of the contract did not make the principal undisclosed or partially disclosed" under prevailing law.  *Id.* (*citing* Restatement of the Law 3d, Agency (2001), Tentative Draft No. 2, Chapter 2, Topic 4 (noting that agency law does not operate in isolation from other doctrines); U.C.C. 3-402; and Ohio Rev. Code § 1303.42(B)(1)-(2)).

The parties agree that J-Star Consolidated, Inc. was a registered corporation when both the original Lease and subsequent modification were signed.  Doc. 67 at 2-3; Doc. 70 at 3.  Therefore, James Jacobs' signature on the Lease, as described above, was valid and effective in a representative capacity and the lack of the corporate form does not render James Jacobs personally liable on the Lease.

With regard to the Lease modification, although "mere adoption of the contract by the corporation will not relieve promoters from liability in the absence of a subsequent novation," *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 524 (Ohio 1994), a promoter will be relieved of liability if the corporation is later formed, the agreement states that the corporation is to be responsible and liable, the corporation acts consistently with the obligations of the contract,

and the corporation formally adopts the contract.  *Id.*  If such is not the case, both promoter and

the later formed corporation may be liable.  However, Ohio law allows for some flexibility in

applying this characteristically rigid law, based on the reality of the parties' dealing and their

intent:

> Generally speaking, the real parties to a simple contract should be determined from the intention of the parties as expressed by the instrument itself. If the terms of the instrument show an intention to bind the principal, the agent is not liable, since intention gathered from the terms of the instrument must control. Whether or not an instrument has been executed in an individual or in a representative capacity must be determined from the whole instrument, and if, giving full effect to all the terms in which the contract is expressed, it plainly appears from the instrument itself that the true object and intent is to bind the principal, not the agent, the court will adopt that construction, however informally it may be expressed.

3 Ohio Jur. 3d 206 *Agency* § 134.  *See Papas v. Bookwalter*, 1984 WL 4138 at *3 (Ohio Ct. App.

1984) (allowing corporate but not personal liability where contract did not indicate personal

liability, parties knew that the corporation was the actual party to the lease, and parties were aware

that signors were acting as agents for the corporation); *Ohio Carpenters' Finge Benefit Fund v.

Krulak*, 2008 WL 192130 at *5-6 (Ohio Ct. App. 2008).

In the case before this Court, it is clear from the terms of the contract that the tenant to the

Lease modification was the corporation, Jacobs Industries, a corporation which was shortly

thereafter officially registered and with which Norfolk Southern dealt consistently with the

contract throughout the term of the contract.  Also indicative of the parties' mutual intent is the

fact that his agreement was a modification to a Lease that was signed by both parties, including

Jacobs in an effectively representative capacity on behalf of a registered corporation (as discussed

above).  This modification agreement could not stand alone, and it would defy reason to consider

it in isolation from the agreement which it was modifying and to which it explicitly referred.  The

14

intentions of the parties that Jacobs Industries, and not James Jacobs himself, be responsible for and liable on the contract is abundantly clear and carries over to the modification.  Ohio law provides ample basis on which to dismiss Norfolk Southern's formalistic argument when, as here, it has no relation to the reality of the contractual dealing and the parties' evident intent.

### B. Unambiguity of "expected train volume" language

Jacobs has requested that the Court exercise its jurisdiction under 28 U.S.C. § 2201 to declare that the Service Agreement is ambiguous, and that extrinsic evidence is admissible to help the fact-finder determine the meaning of the Service Agreement's ambiguous phrases. *See* 3d Party Compl. at ¶¶ 49–55.  Determining this issue "will serve a useful purpose in clarifying and settling the legal relations in issue," as it will determine whether extrinsic evidence will be admissible to alter the meaning of the contractual language.  *Zide Sport*, 16 Fed. Appx. at 437.  A judgment on this issue will also relieve the uncertainty regarding how the contract is to be interpreted and whether Jacobs' cause of action will be practically sustainable.  The Court therefore finds it appropriate to exercise its jurisdiction and issue a declaratory judgment on the ambiguity of the Service Agreement language at issue.

The Service Agreement provides that the agreement is to be governed by the laws of the Commonwealth of Pennsylvania.  Service Agreement, Article 16, ¶C.  Pennsylvania law governing the interpretation of contracts generally bars the introduction of prior negotiations or agreements when a final, written, integrated contract is entered into between the parties.  Where "the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing.  Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual

intent." *Duquesne Light Company v. Westinghouse*, 66 F.3d 604 (3rd Cir. 1994).   The Supreme

Court of Pennsylvania has articulated the parol evidence rule, giving deference to

integration clauses, as follows:

> In the absence of fraud, accident or mistake, parol evidence as to preliminary
> negotiations or oral agreements and as to a prior or contemporaneous oral promise
> or representation or agreement is not admissible in evidence if it adds to or
> modifies or contradicts or conflicts with a written agreement which purportedly
> contains the entire agreement between the parties.

*Bokser v. Lewis*, 383 Pa. 507, 511 (Pa. 1956).  Jacobs has not alleged fraud, accident, or mistake,

nor is there evidence on the record that fraud, accident, or mistake caused Jacobs to assent to the

Service Agreement.

Pennsylvania law on the issue poses a standard which Jacobs cannot overcome.  The

language at issue is as follows: "Conrail will supply or make available expected train volume and

arrival times by the end of each working day, but Conrail does not guarantee actual train arrival

times."  Service Agreement at ¶ 21.  Jacobs' primary contention is that the phrase "expected train

volume" is ambiguous because it does not specify what defines the phrase or what constitutes

"expected train volume."  Jacobs does not argue that he is not aware of what the term actually

refers to -- it refers to the number of vehicles to be transloaded at the Terminal.  In other words,

Jacobs' argument is really one of indeterminancy of the "expected . . . volume."  Jacobs has not

shown, and in the Court's opinion cannot show, that such lack of a specific numerical (i.e., 28,000

vehicles) or even categorical (i.e., all of the Jeep plant's production) qualifier constitutes an

ambiguity.  Rather, it is clear on the face of the contract that the parties chose to use numerically

indeterminate language to refer to the volume of vehicles to be transloaded at the Terminal.  The

difference between ambiguity (i.e., what is "expected train volume," or what does that phrase

mean?) and indeterminancy (i.e., what "volume," or how many vehicles, are "expected" to be transloaded?) is both clear and critical. There is no ambiguity, even if there is a certain degree of generality. Therefore, in the undisputed presence of a clear and standard integration clause, the extrinsic evidence of negotiations or prior or contemporaneous representations or agreements is not admissible to modify the language by adding a numerical or even a categorical qualifier to the phrase "expected train volume." Agreements after the Service Agreement's signing are also prohibited, as there is no evidence that they constituted contract modifications with the required additional contractual requirements.

Furthermore, even if the extrinsic evidence were to be considered, it does not, taken collectively, establish that the parties intended to reach a volume commitment. The documents and communications may show that the possibility of a volume commitment was part of the negotiating process. Taken collectively, however, and considering that the Service Agreement ultimately conspicuously lacked a numerical volume commitment, the documents at most show a give-and-take both between and within the parties' bargaining actors on whether to include such a commitment, and ultimately, no commitment was included. In other words, the indeterminancy was bargained for and agreed upon. The documents make reference to understandings, contingencies, and proposals, but never to a final decision to commit a certain number of vehicles. *Cf. Giant Food Stores, Inc. v. Marketplace Communications Corp.*, 717 F.Supp. 1071 (M.D. Pa. 1989) (allowing extrinsic evidence in spite of integration clause where letters from both parties evidenced consent to establish minimum compensation and explicitly stated, "the following change will be made to the agreement. . .").

### C. Liability for utility bills and taxes

17

The parties dispute who is liable for the utility and tax bills on the Property over the term of the second five-year lease. During the first five year term, the Service Agreement amended the Lease such that Norfolk Southern paid the utility and tax bills during that time. When the Service Agreement expired, and the parties renewed the Lease for an additional five years, the obligation to pay utility and tax bills shifted back to the tenant, Jacobs. However, over that period, Norfolk Southern received the utility bills, as it had over the previous five years, and paid the bills, again as it had over the previous Lease term. Although the bills arrived periodically, and Norfolk Southern paid them periodically, it was not until a few months before the end of the second five year period that Norfolk Southern invoiced Jacobs for nearly five years' worth of utility and tax bills.

Jacobs argues that Norfolk Southern waived its right to utilities and taxes by paying the bills for five years without invoicing Jacobs. In Ohio, a party may waive a contractual right either expressly or constructively. *McMillen v. Willys Sales Corp.*, 193 N.E.2d 160, 169 (Ohio Ct. App. 1962). "'Waiver,' as applied to contracts, is a voluntary relinquishment of known rights." *Automated Solutions Corp. v. Paragon Data System*, 167 Ohio App.3d 685 at 695 (Ohio Ct. App. 2006). In Ohio, waiver occurs when a party, by clear and unequivocal act or words, indicates that it intends to waive a certain contractual right. "A party asserting a waiver must prove a clear, unequivocal, decisive act by the party against whom the waiver is alleged." *Id.* (citing *White Co. v. Canton Transportation Co.*, 131 Ohio St. 190 (Ohio 1936)); *Clay v. Clay*, 2007 Ohio 4638 (Ohio Ct. App. 2007); *Mahon-Evans Realty, Inc. v. Gunkelman*, 2007 WL 2812255 (Ohio Ct. App. 2007).

18

Paragraph 19 of the Lease, taken together with the law cited above, makes its impossible for Jacobs to show waiver in this case: "No covenant, form, obligation or condition of this Lease shall be deemed to have been waived by Landlord, unless such waiver is in a notice to Tenant executed by Landlord." Lease at ¶19.  Jacobs' claim of waiver rests of the method and timing of billing – that it was at the end of the term rather than periodically throughout the term.  However, the contract provides no timing method for the billing, and the parties lack a prior course of dealing with utility billing because Norfolk Southern paid the bills during the first five years per the Service Agreement.  Norfolk Southern invoiced Jacobs in April, 2005, a few months ahead of the lease's October 2005 expiration.  Norfolk Southern never provided a notice of waiver as required by the contract.  The Court cannot disregard the Lease's waiver provision.  Although the landlord invoiced the tenant approximately five years into the contract term rather than periodically throughout the term, the contract did not provide for a billing method, the landlord did not waive the right to bill utilities and taxes as provided for by the contract, and the parties did not have a prior course of dealing in invoicing for utilities and taxes.

However, although the Court grants summary judgment to Norfolk Southern and Conrail on the issue of utilities and taxes, those parties have not sufficiently established the legitimate amount of those bills.  Liability is granted, but damages remain to be determined, because there are issues that remain inadequately proven, such as offset for use by the landlords and lack of evidentiary support (i.e., bills from utility companies rather than just invoices from the landlords).

### D. Improvements to the property

During the course of its tenancy at the property, Jacobs had constructed several valuable improvements and other structures on the Property.  The Lease provides:

> Tenant shall completely remove all improvements made by Tenant upon the
> Premises prior to the termination of this Lease. . . .  If Tenant fails to completely
> remove such improvements and other property of Tenant, . . . Landlord may elect
> to retain such improvements or property, or enter the Premises and raze or remove
> same and Tenant hereby waives any claim or right of action with respect thereto.

Lease at ¶9.

Norfolk Southern invoiced Jacobs for almost five years of utilities in April, 2005.  As noted above, this was a few months prior to the Lease's termination by its own terms in October, 2005.  Norfolk Southern had been paying the utility and tax bills since the beginning of the Lease renewal period in 2000 without invoicing Jacobs.  When Jacobs did not immediately pay the April, 2005 invoiced amount for utilities and taxes, Norfolk Southern considered the contract breached and terminated by July, 2005.  Norfolk Southern argues that, because the contract was breached at that point, it had a right to the improvements, even though Jacobs did attempt, unsuccessfully, to remove the improvements from the property before the termination of the Lease.

The Court has herein found that the Lease clearly entitles Norfolk Southern to the cost of utilities and taxes (when the proper amount is proven).  The Court did not find that Jacobs had committed material breach by not paying the invoiced amount between April and July of 2005 or even July and October of 2005.  Indeed, Norfolk Southern waited almost five years to invoice Jacobs for the utilities and taxes; it can hardly be considered a breach, let alone a material one, for Jacobs to have not paid within a few months toward the end of the Lease term.  Jacobs even has made a legitimate argument that the exact amount has not been proven, as previously discussed.  Jacobs was not in material breach for a delay of mere months in paying invoices that were delayed over four years.  A finding to the contrary would be inequitable and inconsistent with the contract.

20

Therefore, pursuant to paragraph nine of the Lease, Jacobs was entitled to the improvements, and Norfolk Southern was not entitled to prevent their removal by Jacobs prior to the termination of the Lease.  Jacobs is owed, upon a proper showing of damages, the improvements or the value thereof.  The Court need not make a finding of unjust enrichment – the property as well as the improvements and the rights thereto addressed herein are sufficiently provided for by the contracts, and the damages shall be calculated in accordance therewith.

### E. Trespass

Norfolk Southern has moved for summary judgment on Jacobs' claim of trespass on the property while it was under Jacobs' control pursuant to the Lease.  In Ohio, trespass on real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue.  *Apel v. Katz*, 83 Ohio St.3d 11, 19 (Ohio 1998).

Jacobs claims that, while the Lease was in effect and Jacobs was the tenant of the property, Jacobs employees found broken and cut gates and locks, doors pulled off of electrical houses, lights on, igniters lit, the toilets filled, and the office invaded.  At his deposition, James Jacobs testified that he "found [Norfolk Southern] hard hats and so forth in the unit."  J. Jacobs Depo. at 110-11.  This testimony being the only evidence of the alleged trespass, the claim cannot survive summary judgment, even though viewed in the light most favorable to Jacobs.  Jacobs would need evidence beyond the mere finding of hard hats to link the damage to Norfolk Southern.  That Norfolk Southern employees trespassed and committed wide-ranging vandalism of the premises at some indeterminate time requires more than the allegation that official hard hats were found near some of the damage.

With regard to the allegation that Norfolk Southern used the rail track on the leased property for railway purposes unrelated to Jacobs' use, the contract provides a basis for dismissing the claim.  Paragraph 5.1 of the Lease provides that Norfolk Southern could "operate existing railroad and related transportation services" on the property.  As such, if Norfolk Southern did use the rail track, it was authorized to do so by the Lease, and no trespass can result from the alleged use.

### F. Rail service claim

Jacobs appears to have abandoned its claim of violation of common carrier duties.  Therefore, the Court will grant summary judgment in favor of Norfolk Southern and Conrail on those claims.

Even if Jacobs were to have argued the point, no violation is apparent.  Norfolk Southern would have violated common carrier duties by failing to provide transportation or service to Jacobs upon reasonable request in violation of 49 U.S.C. § 11101 and failing to "furnish safe and adequate car service" in violation of 49 U.S.C. § 11121.  However, Jacobs has not shown the threshold issuance of a reasonable request.  James Jacobs testified that he requested to enter into additional business development with Norfolk Southern by asking about transloading Ford vehicles at the Toledo Terminal.  That, however, is not a request for rail service.  It encompasses much more than a request for shipment, delivery, or other rail service.  By not assenting to the request for Ford work, Norfolk Southern did not deny a reasonable request for rail service in violation of common carrier laws.

## IV. Conclusion

For the reasons discussed herein, Jacobs' motion for declaratory judgment (Doc. 47) is hereby denied.  Norfolk Southern and Conrail's motion for summary judgment (Doc. 53) is hereby granted in part, and denied in part.  It is granted with regard to trespass, common carrier laws, and liability for the utilities and taxes paid during the second Lease period, and denied with regard to liability for the improvements or the value thereof.  James R. Jacobs' motion for summary judgment (Doc. 55) is hereby granted.  Jacobs' (James Jacobs, J-Star Consolidated, Jacobs Industries, and Jacobs Industries Ltd.) motion for summary judgment (Doc. 58) is hereby granted in part and denied in part.  It is granted with regard to the right to improvements, and denied with regard to the breach of contract, unjust enrichment, trespass, and common carrier claims.

IT IS SO ORDERED.

__s/ *David A. Katz*____
DAVID A. KATZ
U. S. DISTRICT JUDGE